Jessie COMER; Jewel Culverhouse; Hazel Grimes; Yvonne Primm; Felicia Stokes; Rosemary Comer; Annette McCutcheon, individually and on behalf of all persons similarly situated, Plaintiffs–Appellants,

Dorothy Solomon; Saren Lewis; Betty Smith; Karen Edmond; Odessa Edwards; Penny Ferguson; Claude Fletcher; Ronda Mapp; Jane Pennick; Tyrone Pennick; Darlene Perry, Proposed Intervenor–Plaintiffs, individually and on behalf of all persons similarly situated, Appellants,

v.

Henry G. CISNEROS, in his official capacity as Secretary of the United States Department of Housing and Urban Development; US Department of Housing and Urban Development; Belmont Shelter Corporation; Town of Amherst, New

---

York; Rental Assistance Corporation of Buffalo; City of Buffalo; Lawrence A. Grisanti, individually and in his official capacity as former Executive Director of Buffalo Municipal Housing Authority; James D. Griffin; Richard L. Higgins, individually and in his official capacity as Commissioner of the New York State Division of Housing and Community Renewal; Buffalo Municipal Housing Authority, Defendants–Appellees.

Nos. 1236, 1237 and 1238, Dockets 93–6207, 93–6253 and 93–6333.

United States Court of Appeals, Second Circuit.

Argued April 18, 1994.

Decided Aug. 26, 1994.

Charles S. Ralston, New York City (Elaine R. Jones, Alice L. Brown, Theodore M. Shaw, NAACP Legal Defense and Educ. Fund, Inc., New York City, Barbra A. Kavanaugh, Dennis McGrath, Neighborhood Legal Services, Inc., Buffalo, NY; Michael L. Hanley, Ellen M. Yacknin, Greater Upstate Law Project, Rochester, NY of counsel), for plaintiffs-appellants and appellants.

Michael E. Robinson, U.S. Dept. of Justice, Washington, DC (Michael Jay Singer, Stuart A. Licht, Felix V. Baxter, Lisa A. Olson, U.S. Dept. of Justice; Frank W. Hunger, Asst. Atty. Gen., Washington, DC; Michael T. Robinson, Howard M. Schmeltzer, Asst. Gen. Counsel for Litigation, Patricia Sharin Flagg, Office of Gen. Counsel, U.S. Dept. of Housing and Urban Development, Washington, DC; James C. Brylinski, U.S. Dept. of Housing and Urban Development, Buffalo, NY; Patrick H. Nemoyer, U.S. Atty., Shirley Troutman, Asst. U.S. Atty., Buffalo, NY, of counsel), for defendant-appellees Secretary of Housing and Urban Development and U.S. Department of Housing and Urban Development.

Daniel Smirlock, Asst. Atty. Gen., Albany, NY (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Mark R. Walling, Albany, NY, of counsel), for defendant-appellee Richard L. Higgins.

Sally S. Mennen, Buffalo Mun. Housing Authority, James N. Schmit, Ian A. Bradford, Damon & Morey, Buffalo, NY, of counsel, for defendant-appellee Buffalo Mun. Housing Authority.

Charles C. Swanekamp, Saperston & Day, Buffalo, NY, for defendant-appellee Belmont Shelter Corp.

John P. Lane, Deputy Town Atty., Williamsville, NY, for defendant-appellee Town of Amherst, New York.

Sharon Porcellio, Lippes, Silverstein, Muthias & Wexler, Buffalo, NY, for defendant-appellee Rental Assistance Corp. of Buffalo.

R. Peter Morrow, III, Corp. Counsel's Office, Buffalo, NY, for defendants-appellees City of Buffalo, Lawrence A. Grisanti and James D. Griffin.

Michael E. Deutsch, Center for Constitutional Rights, and Nat. Lawyers' Guild, New York City, for amicus curiae.

Before: OAKES, KEARSE, and MAHONEY, Circuit Judges.

OAKES, Senior Circuit Judge:

The plaintiffs, low-income minority individuals, brought this class action on behalf of all former, current, and future minority residents of Buffalo, New York public housing projects and applicants for federal housing assistance in Erie County, New York. The original complaint alleged racial discrimination and segregation in public housing and assistance programs. The district court dismissed the complaint for lack of standing. The court also dismissed as moot the claims brought by all eleven proposed plaintiffs-intervenors.

In light of the procedural posture of this case, we must resolve several questions of law:

(1) Whether the plaintiffs and proposed intervenors, as low-income, minority residents of the City of Buffalo who have applied for or received rental housing subsidies from the Rental Assistance Corporation of Buffalo ("RAC"),[1] have standing to challenge, as ra-

---

1. This case presents many abbreviations. For the reader's convenience, we list these acronyms below:

*PHAs*—Public Housing Agencies
*RAC*—Rental Assistance Corporation of Buffalo

*Belmont*—Belmont Shelter Corporation
*BMHA*—Buffalo Municipal Housing Authority
*HUD*—Department of Housing and Urban Development
*CDBG*—Community Development Block Grant Program

cially discriminatory: (a) RAC's policy and practice of prohibiting the majority of its rental housing subsidies from being used in the suburbs of Buffalo; and (b) RAC's minority participation outreach efforts.

(2) Whether the plaintiffs and proposed intervenors, as low-income, minority residents of the City of Buffalo who have applied for rental housing subsidies from the Belmont Shelter Corporation ("Belmont"), have standing to challenge, as racially discriminatory: (a) Belmont's "suburban residency preference" policy which gives some suburban residents and workers subsidies ahead of Buffalo residents; and (b) Belmont's minority participation outreach efforts.

(3) Whether any of these claims are moot.

(4) Whether we have jurisdiction to review the claims against the Buffalo Municipal Housing Authority ("BMHA").

(5) Whether the plaintiffs are entitled to class certification on behalf of the various sub-classes.

We must also decide:

(6) Whether, in the event of reversal, we should transfer this case to another district court judge on remand.

(7) Whether the district court properly dismissed the claims against state-defendant Richard L. Higgins.

We now affirm the judgment as to Higgins, dismiss the appeal as to BMHA for lack of appellate jurisdiction, and vacate the district court's judgment in all other respects.

## I. Jurisdiction

The district court had jurisdiction over this civil rights action under 28 U.S.C. §§ 1331, 1343(a)(3), (4) (1988), and, over the state law claims, under 28 U.S.C. § 1367 (Supp. IV 1992). Pursuant to a June 2, 1993, published opinion, the district court granted summary judgment to the Belmont and RAC defendants thereby dismissing the Belmont and RAC complaints in their entirety on grounds that the plaintiffs lacked standing. *Comer v. Kemp*, 824 F.Supp. 1113, 1134 (W.D.N.Y. 1993). With respect to the BMHA complaint, the district court dismissed the claims against state-defendant Richard L. Higgins

concerning the federal projects, severed the claims against Higgins pertaining to the state projects, and held that although the BMHA plaintiffs lacked standing to pursue declaratory and prospective injunctive relief, they did have standing to pursue claims for compensatory damage for past discrimination. *Id.* Finally, the court denied the plaintiffs' motion for class certification in the BMHA complaint, and implicitly in the RAC and Belmont complaints. On August 19, 1993, the district court dismissed the claims against Higgins and certified, as final under Fed.R.Civ.P. 54(b), the judgments against all defendants except the BMHA and the City of Buffalo in the BMHA matter. *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. Aug. 19, 1993) (order granting entry of final judgment on to certain defendants). On September 9, 1993, the plaintiffs and the intervenors filed a new notice of appeal from this order. On November 5, 1993, the court issued an order of clarification, which stated that its June 2, 1993, judgment had denied the motions of the intervenors as moot. On November 9, 1993, the intervenors filed a notice of appeal from the November 5 order. Thus, pursuant to 28 U.S.C. § 1291 (1988), this court has jurisdiction over all of the plaintiffs' and intervenors' claims except those against BMHA and the City of Buffalo in the BMHA complaint.

## II. Background

This case presents the substantive issue of racial discrimination and segregation in housing. Specifically for us, this case presents an instance where the court house doors have remained closed to individuals and similarly situated individuals who have presented "a significant and serious claim of racial discrimination in the local administration of a public housing program," *Comer v. Kemp*, No. 92–6247 (2d Cir. Jan. 13, 1993) (order affirming judgment of district court denying plaintiffs' motion for a preliminary injunction). To understand how the court house doors have remained closed to these individuals, it is helpful to understand the statutory and regulatory foundations as well as the institutional structures that have given rise to this rancorous law suit. Although many of these background facts have been set forth in

*FHA*—The Fair Housing Act of 1968
*HCDA*—Housing and Community Development Act of 1974

*DHCR*—New York Division of Housing and Community Renewal
*MSA*—Metropolitan Statistical Area

the lower court's opinion, *Comer v. Kemp*, 824 F.Supp. at 1116–19, we find it necessary to expand upon, although in part to duplicate, them. We do not review the facts underlying the plaintiffs' dispute with BMHA, except as they touch upon the remaining disputes, because, as we have noted above, we do not have appellate jurisdiction over the dispute with BMHA.

### A. Statutory and Regulatory Background

This case involves two federally subsidized rental housing programs for low-income families. The first provides federal financial assistance to Public Housing Agencies ("PHAs") to help finance and maintain PHA owned and operated, lower-income public housing projects. 42 U.S.C. §§ 1437b–1437d (1988 & Supp. IV 1992). A PHA is "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. § 1437a(b)(6) (Supp. IV 1992). The PHA is responsible for selecting and assigning tenants as well as for physically maintaining the projects. Typically, the PHA is a not-for-profit, municipal corporation which arranges for a separate agency to administer the local, lower-income housing program.

The second, known as the Section 8 Existing Housing Program ("Section 8"), provides subsidies to private landlords. *See* Housing and Community Development Act of 1974 ("HCDA"), 42 U.S.C. § 1437f (1988 & Supp. IV 1992). Under the Section 8 program, qualifying tenants pay a portion of their income to the landlord. 42 U.S.C. § 1437a(a) (1988 & Supp. IV 1992). To raise these payments to market level rents, Section 8 authorizes the PHA to make "assistance payments" to the landlords by using federal funds made available by contract with the United States Department of Housing and Urban Development ("HUD"). 42 U.S.C. § 1437f(b), (c) and (*o*).

To participate in the Section 8 program, an eligible family applies to a local PHA. The PHA then puts the eligible family on a waiting list according to three statutorily mandated selection priorities or preferences: (1) families who occupy substandard housing; (2) families who are involuntarily displaced; and (3) families who are paying more than 50 percent of family income for rent. 42 U.S.C. § 1437f(*o*)(3); 24 C.F.R. §§ 882.219, 887.157 (1993).[2] In general, the PHA must place applicants who qualify for a federal preference on the waiting list ahead of applicants who do not. The PHA, however, "must apply the Federal preferences in a manner that is consistent with," (1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d–7 (1988) (non-discrimination in federally-assisted programs); Title VIII of the Civil Rights Act of 1968 (the "Fair Housing Act" or "FHA"), 42 U.S.C. §§ 3601–3631 (1988 & Supp. IV 1992); and other equal opportunity legislation, rules, and regulations; (2) "the selection and participation provisions of § 882.209 (including limitations on the use of local residency requirements and preferences contained in § 882.209(a)(4)(i));" and (3) other applicable regulations. 24 C.F.R. § 882.219(b)(1), (3). And, of course, the PHA must administer these preferences in a manner that is constitutional.

HUD argues that the HCDA 1992 amendment recognizes that PHAs have discretion to adopt a local preference in addition to the mandatory federal preferences. 42 U.S.C. § 1437f(*o*)(3). *See also* 24 C.F.R. §§ 882.209(a)(4), 882.219(b)(2)(iii). According to HUD, although Section 8 assistance is "portable," "the Act restricts 'portability' during the first 12 months after a non-resident's receipt of assistance" in order "to help PHAs meet the housing needs of their local residents, and to discourage 'waiting list shopping.'" Brief of Appellee–HUD at 9 (citing H.R.Conf.Rep. No. 102–760, 102d Cong., 2d Sess. 90 (1992), *reprinted in,* 1992 U.S.C.C.A.N. 3281, 3370). To support this argument, HUD quotes this section of the Act, as amended in 1992:

> any family not living within the jurisdiction of a public housing agency at the time that such family applies for assistance from such agency shall, during the 12–month period beginning upon the receipt of any

---

**2.** All citations to C.F.R. are to the year 1993 unless otherwise indicated.

tenant-based rental assistance made available on behalf of the family, use such assistance to rent an eligible dwelling unit located within the jurisdiction served by such public housing agency.

42 U.S.C. § 1437f(r)(1) (1988 & Supp. IV 1992). HUD also reminds us that, under the Act, a PHA

may provide for circumstances in which families who do not qualify for [a Federal preference] are provided assistance under this subsection *before* families who do qualify for such preference, except that not more than 10 percent ... of the families who initially receive assistance in any 1–year period ... may be families who do not qualify for such preference.

42 U.S.C. § 1437f(o)(3)(B) (1988 & Supp. IV 1992) (emphasis added). Furthermore, HUD authorizes PHAs to apply non-federal preferences in such a way as to give applicants, who qualify for *both* a federal preference and a local preference, priority over federal preference holders who do not qualify for a local preference. 24 C.F.R. §§ 882.219(b)(2)(iii)(A), 887.157(b)(2)(iii)(A). HUD argues that, under the appropriate circumstances, a PHA may assist a family which does not qualify for a federal preference, before it assists a family which does qualify for a federal preference, but which does not live in the applicable housing jurisdiction at the time of application. At the same time, however, a family that lives within the jurisdiction of the PHA at the time of the application can continue to rent a unit anywhere in the state or metropolitan statistical area.

As each family moves off the waiting list to participate in the Section 8 program, the local PHAs issue the family a "certificate" or "voucher" which entitles them to "assistance payments" in the manner described above. "Certificate" and "voucher" systems are substantially similar; the primary difference between the two is the method of calculating how much rent a participating family must pay, and significantly, prior to July 2, 1990, certificates were not permitted to be used outside the local PHA market area. Both certificates and vouchers are "portable," that is, Section 8 subsidies are not linked to the rental unit. Thus, once the local PHA issues

the certificate or voucher, the recipient family may carry the certificate or voucher from its chosen apartment to the next apartment so long as the landlord participates in the program and the apartment "is within the same State, or the same or a contiguous metropolitan statistical area as the metropolitan statistical area within which is located the area of jurisdiction of the public housing agency approving such assistance." 42 U.S.C. § 1437f(r)(1). The family conveys the certificate or voucher, together with the family's previously determined rent contribution, to the landlord who then presents the certificate or voucher to the PHA, which pays the balance of the rent. HUD then reimburses the local PHA. 42 U.S.C. §§ 1437f(b), (o). The PHA enters into an Annual Contributions Contract with HUD which provides for the payment of administrative fees by HUD to the PHA. In connection with this contract, the PHA must submit an Administrative Plan and an Equal Housing Opportunity Plan describing the administrative details of the Section 8 program and its compliance with federal and state equal housing requirements. 24 C.F.R. § 882.204(b)(1), (3). As part of its Administrative Plan, the PHA must describe the geographic area that its program serves. 24 C.F.R. § 882.203(b)(3); *see also* 24 C.F.R. § 887.61. As part of its Equal Housing Opportunity Plan, the PHA must describe its policies and procedures for (1) "[o]utreach to eligible families," (2) achieving the participation of qualified landlords both "outside areas of low income or minority concentrations," and "outside the local jurisdiction in any area where the PHA is not legally barred from entering into contracts," (3) "[s]electing families for participation without discrimination because of ... race," and (4) "[a]ssisting housing voucher holders who allege that illegal discrimination is preventing them from leasing suitable units." 24 C.F.R. § 887.59.

HUD uses metropolitan statistical areas ("MSAs") to delineate PHA market areas. 53 Fed.Reg. 36,701 (1988); *see also* 24 C.F.R. § 888.113. Using this system, HUD identified all of Erie County, including the City of Buffalo, as a single housing market. Notwithstanding this fact, HUD has permitted

the two Section 8 programs at issue here to operate within Erie County.

HUD authorized the City of Buffalo, as a PHA, to operate a Section 8 program. Buffalo then contracted with RAC to administer the program. HUD also authorized the Town of Amherst, as a PHA, to operate a Section 8 program on behalf of the 41–community suburban consortium. Amherst contracted with Belmont to administer its Section 8 program.

### B. The Defendants/Appellees PHAs and Administering Entities—An In-Depth Examination

#### 1. Buffalo and RAC

RAC is the not-for-profit corporation which has contracted with the City of Buffalo, as the PHA, to administer Buffalo's Section 8 program. Over ninety percent of the households which RAC services are minority households.

RAC maintains a waiting list of eligible households who have applied for RAC-administered housing assistance. As of August 1990, RAC combined its waiting list with that of BMHA. Accordingly, RAC automatically places a person applying for RAC housing on BMHA's waiting list and visa versa. The administrative agent chooses the applicant by the date of application with priority given to those applicants who claim a federal preference. As of late October 1990, the waiting list contained over 7,000 applicants, seventy-percent of whom claimed a federal preference. According to RAC, "[b]ased on our current rate of turnover in the program, it would take at least nine years for all of the applicants claiming federal preferences to be offered assistance by RAC. An applicant who did not claim a federal preference, but who was otherwise eligible for the program, would have virtually no likelihood of receiving housing assistance because the number of applicants who meet the federal preference is always larger than the number of available units. Accordingly, an applicant who does not qualify for the federal preference as a practical matter would never be offered assistance." Affidavit of George Fanelli in Support of RAC's Motion to Dismiss, for Summary Judgment, and in Opposition to Motion for Class Certification, *Comer v. Kemp,* No. 89–1556 (W.D.N.Y. filed Nov. 9, 1990) ("Fanelli Aff."), at 5, ¶ 17. Once the agent chooses an applicant from the waiting list, RAC provides the applicant with either a voucher or a certificate. The plaintiffs challenge only the certificate program as racially discriminatory.

Since 1975, under the Community Development Block Grant ("CDBG") program, HUD has paid in excess of $269 million to the City of Buffalo, which has used the funds to pay all or part of its housing code enforcement program. As conditions to receive CDBG funds, the grantee must (1) "affirmatively further fair housing," 42 U.S.C. § 5304(b)(2) (1988 & Supp. IV 1992); (2) administer the grant in conformance with Title II of the Civil Rights Act of 1964, The Public Accommodations Act, 42 U.S.C. §§ 2000a to 2000a–6 (1988); 42 U.S.C. §§ 2000d to 2000d–7 (non-discrimination in federally-assisted programs); and the FHA, 42 U.S.C. §§ 3601–3631; and (3) submit an annual performance report for HUD's review, 42 U.S.C. § 5304(e) (1988). This report must address the CDBG recipient's compliance with Title VI and Title VIII, and the recipient's efforts at meeting the statutory obligations to promote fair housing under 42 U.S.C. § 5304(b)(2).

#### 2. Amherst and Belmont

HUD has authorized the Town of Amherst, as a PHA, to operate the Section 8 program on behalf of the Erie County PHA consortium. The Erie County PHA Consortium comprises 41 municipalities which surround the City of Buffalo, but does not include the City of Buffalo itself or the communities of Kenmore or Wales.

In 1977, Amherst contracted with the not-for-profit agency, Belmont, to administer the suburban Section 8 program on behalf of the consortium. The Belmont Section 8 program is in some ways similar to the RAC Section 8 program. Belmont is directly responsible for the daily administration of the Erie County consortium's Section 8 programs and for the selection of program participants pursuant to federal and state law. Belmont also has established a waiting list because there are more applicants to it for Section 8 subsidies than there are funds available for assistance. 24 C.F.R. §§ 882.209(a)(7), 887.153. Regard-

ing the selection process, Belmont must adhere to the same regulations governing federal preferences as RAC. *See also* 24 C.F.R. §§ 882.219, 887.157. Belmont also promotes housing development, construction of affordable homes and apartments, and supervises the management of subsidized apartments.

Like RAC, in addition to the federally mandated preference structure, Belmont awards a local preference to applicants who live or work in one of the consortium communities on the grounds that such a preference is *permitted* by statute and the HUD regulations. 42 U.S.C. § 1437f(*o*)(3)(B); 24 C.F.R. § 882.219(b)(2)(iii)(A). Consequently, Belmont ranks applicants on its waiting list for Section 8 assistance as follows: (1) applicants who claim both a federal and a local preference, (2) applicants who claim only a federal preference, (3) applicants who claim only a local preference, and (4) applicants who do not claim a preference. *See* Affidavit of Elizabeth Huckabone in Support of Belmont's Motion to Dismiss, for Summary Judgment, and In Opposition to Motion For Class Certification, *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. filed Nov. 9, 1990) ("Huckabone Aff. I") Attachment 1 at 4–5, ¶ 11. Belmont then selects applicants from within each category based on the date and time of application. *Id.* at 5, ¶ 12.

The plaintiffs contend that Belmont's local preference structure has prevented minorities from moving to the suburbs. Brief for Appellants at 21. Belmont and HUD argue that the consortium is merely establishing a preference for individuals who live or work in a member community. Brief for Appellee–HUD at 12 n. 7. Moreover, Belmont contends that, as of March 1991, the use of a local preference has had no effect on applicants without a federal preference because, due to "the large number of applicants presently on the waiting list" and the lack of funding, Belmont has been servicing only the neediest low income families in the consortium, that is, only those families who are eligible for a federal preference. *See* Huckabone Aff. I at 5, ¶ 13; Affidavit of Elizabeth Huckabone in Support of Belmont's Motion to Dismiss for Summary Judgment, and In

Opposition to Motion For Class Certification, *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. filed Mar. 14, 1991) ("Huckabone Aff. II") at 2, ¶ 4.

### 3. BMHA

We save a consideration of the BMHA facts for the end of this opinion where we treat the district court's decision as to Richard L. Higgins.

### III. Procedural History

On December 4, 1989, (1) the Buffalo League of Public Housing Tenants, and (2) several low-income minority individuals, Jessie Comer, Jewel Culverhouse, Hazel Grimes, Yvonne Primm, Rosemary Comer, Matilda Santiago, Rosetta Weeden, and Annette McCutcheon (the "named plaintiffs"), individually, and on behalf of all persons similarly situated, filed a complaint alleging racially discriminatory housing policies and practices. *See* Complaint, *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. filed Dec. 4, 1989) ("Original Complaint"). On February 20, 1990, they filed a motion for class certification. The defendants named in the original complaint were: Jack Kemp, in his official capacity as Secretary of HUD; HUD; the Buffalo Municipal Housing Authority ("BMHA"); the City of Buffalo, New York; James D. Griffin, in his official capacity as Mayor of the City of Buffalo; Richard L. Higgins, individually and in his official capacity as Commissioner of the New York State Division of Housing and Community Renewal ("DHCR"); the RAC; the Town of Amherst, New York; and Belmont. The complaint asked the court to enjoin the racially discriminatory policies and practices in the defendants' operation of three interrelated subsidized housing programs in the Buffalo metropolitan area. *See* Original Complaint.

On July 10, 1990, the United States District Court for the Western District of New York, John T. Curtin, *Judge,* ordered the plaintiffs to divide their claims into three separate actions and to file three amended complaints, "for the purpose of clarity and to provide a guide for the conduct of depositions to follow on the class certification issues," *Comer v. Kemp*, 824 F.Supp. at 1115 (referring to First Amended Complaint, *Comer v.*

*Kemp,* No. 89–1556[RAC] (W.D.N.Y. filed Jul. 23, 1990) ("RAC Complaint"); First Amended Complaint, *Comer v. Kemp,* No. 89–1556 [BELMONT] (W.D.N.Y. filed Jul. 23, 1990) ("Belmont Complaint"); First Amended Complaint, *Comer v. Kemp,* No. 89–1556 [BMHA] (W.D.N.Y. filed Jul. 23, 1990) ("BMHA Complaint")).

## A. RAC Complaint

Jessie Comer, Hazel Grimes, Yvonne Primm, and Felice Stokes, individually and on behalf of themselves and all those similarly situated, (the "RAC plaintiffs"), filed a First Amended Complaint against HUD and then-HUD Secretary Jack Kemp (the "federal defendants"); RAC; and the City of Buffalo (collectively, the "RAC defendants"). As HUD points out, current HUD Secretary Henry G. Cisneros should be substituted for Jack Kemp. Brief for Appellee–HUD at 17 n. 8 (citing Fed.R.App.P. 43(c)).

The RAC plaintiffs brought two sets of claims against the RAC defendants bearing on (1) RAC's alleged unlawful segregation and racial discrimination and (2) the City's alleged violation of the CDBG Program. In particular, the RAC plaintiffs allege the following constitutional claims: In the pursuit and/or administration of the policies, practices, and procedures discussed above, (1) the City of Buffalo and RAC, acting under color of state law, intentionally (a) deprived the RAC plaintiffs of their constitutionally-protected property interests without due process of law, and (b) denied them equal protection of the law in violation of the Fourteenth Amendment; (2) the federal defendants, the City of Buffalo, and RAC have intentionally deprived the RAC plaintiffs of their right to be free from racial discrimination (a) in the making of contracts, 42 U.S.C. § 1981 (1988 & Supp. IV 1992), and (b) in the leasing of real property, 42 U.S.C. § 1982 (1988); (3) the federal defendants, by funding, approving, and failing to remedy racial discrimination in RAC's Section 8 Program, have intentionally deprived the RAC plaintiffs of their constitutionally-protected property rights without due process of law and have intentionally denied them equal protection of the law in violation of U.S. Const. amend. V; and

(4) by virtue of RAC's use of federal CDBG funds for housing code enforcement, the City of Buffalo, acting under color of state law, has intentionally (a) deprived the plaintiffs of their constitutionally protected property interests without due process of law, and (b) denied them equal protection of the law guaranteed by the Fourteenth Amendment, as well as (c) denied them rights granted under the HCDA. *See* RAC Complaint, ¶¶ 126, 124, 125, 127, and 142 respectively.

The RAC plaintiffs raise the following statutory claims as well: (1) the federal defendants, the City of Buffalo, and RAC have made rental housing unavailable on the basis of race in violation of the FHA, 42 U.S.C. § 3604; (2) the federal defendants, (a) by funding RAC's racially discriminatory housing program, have violated their statutory obligation to administer the RAC Section 8 program in a manner consistent with the FHA, 42 U.S.C. § 3608(d) and (e)(5); and (b) by failing to ensure that RAC housing is administered in a non-discriminatory manner, have violated 42 U.S.C. § 2000d, the FHA, 42 U.S.C. § 3601, and the United States Housing Act of 1937, 42 U.S.C. §§ 1437, 1441, 1441a (1988 & Supp. IV 1992); (3) the City of Buffalo and RAC, (a) by failing to administer the RAC Section 8 program in a manner which prevents or eliminates racially discriminatory housing practices, have violated the FHA, 42 U.S.C. § 3608, (b) by excluding the RAC plaintiffs in the participation of, and by denying them the benefits of this federally-funded program, have violated 42 U.S.C. §§ 2000d to 2000d–7, and, acting under color of state law, (c) deprived them of their rights granted under federal law, including, Title VI, the FHA, and the United States Housing Act of 1937. *See* RAC Complaint, ¶¶ 128, 129, 132, 133, 130, 131, and 135 respectively.

By virtue of its use of federal CDBG funds for housing code enforcement in the City of Buffalo, the RAC plaintiffs raise several other statutory claims including: (1) the City of Buffalo has failed to remedy racial discriminatory practices of its Section 8 Program in violation of its duties to (a) affirmatively further fair housing, HCDA, 42 U.S.C. § 5304(b)(2), (b) administer the grant consis-

tent with Title VI and the FHA, 42 U.S.C. § 5304(b)(2); (2) the federal defendants have violated their duty to administer the program in a manner which eliminates discriminatory housing practices, 42 U.S.C. §§ 3608(d) and (e)(5). *See* RAC Complaint, ¶ 139, 140, and 143 respectively.

Finally, the RAC plaintiffs have alleged that the City of Buffalo and RAC have violated New York state law through the same actions described above. RAC Complaint, ¶ 136 (citing N.Y. Const. art. I, § 11; N.Y.Exec.Law § 296(5) (McKinney 1993 & Supp.1994); N.Y.Civ.Rights Law, §§ 18-a to 19-b (McKinney 1992)).

### B. Belmont Complaint

Jessie Comer and Jewel Culverhouse, individually and on behalf of themselves and all those similarly situated, (the "Belmont plaintiffs") filed a First Amended Complaint against Belmont, Town of Amherst, and the federal defendants (collectively, the "Belmont defendants").

The Belmont plaintiffs raise both constitutional and statutory claims with respect to two sets of claims against the Belmont defendants: (1) Belmont's alleged unlawful segregation and racial discrimination and (2) the alleged violation of the CDBG Program. The Belmont Complaint is identical to the RAC Complaint, *compare* RAC Complaint, ¶¶ 123–138 *with* Belmont Complaint, ¶¶ 96–111, except in a few instances regarding the federal CDBG grant program, *compare* RAC Complaint, ¶¶ 139–146 *with* Belmont Complaint, ¶¶ 112–116, which we now enumerate: (1) the Town of Amherst and the federal defendants have failed to administer the CDBG program in a manner that affirmatively furthers fair housing, in violation of the HCDA, 42 U.S.C. § 5304, and the FHA, 42 U.S.C. §§ 3608(d) and (e); (2) the federal defendants have violated the HCDA, 42 U.S.C. § 5304, and the FHA, 42 U.S.C. §§ 3608(d) and (e), by failing to remove the Consortium's non-federal, local preference. *See* Belmont Complaint, ¶¶ 112–113.

### C. Procedural Summary

On November 9, 1990, the federal defendants filed motions to dismiss the RAC, Belmont and BMHA complaints for lack of standing and in opposition to the motion for class certification. The other defendants filed similar motions. On June 3, 1991, the district court heard oral argument on these motions. On June 2, 1993, almost two years after oral argument was heard, and over two and one-half years after the defendants filed motions to dismiss, the district court dismissed the various complaints for lack of standing and mootness.

### IV. Standard of Review

This case, insofar as it involves the RAC and Belmont complaints, comes before us on the district court's grant of the defendants' motion to dismiss the complaint for lack of standing and for summary judgment. Fed.R.Civ.P. 12(c), 56(b), and 56(c); RAC's Motion to Dismiss, for Summary Judgment, and in Opposition to Motion for Class Certification, *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. filed Nov. 9, 1990); Belmont's Motion to Dismiss for Summary Judgment, and In Opposition to Motion For Class Certification, *Comer v. Kemp*, No. 89–1556 (W.D.N.Y. filed Nov. 9, 1990); *see also Comer v. Kemp*, 824 F.Supp. at 1119, 1134 (granting, *inter alia*, summary judgment to the Belmont and RAC defendants). We review the grant of a motion to dismiss or summary judgment *de novo*, accepting as true the factual allegations of the RAC and Belmont complaints, *see, e.g., Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, ⸻ U.S. ⸻, ⸻, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993) (motion to dismiss); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S.Ct. 1922, 1923, 90 L.Ed.2d 413 (1986), and drawing inferences based upon these allegations in the light most favorable to the RAC and Belmont plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 235, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1217 (2d Cir.1994); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993). We affirm an award of summary judgment if the moving party can demonstrate that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of

law." Fed.R.Civ.P. 56(c). "Thus, summary judgment is warranted where the non-moving party has no evidentiary support for an essential element on which it bears the burden of proof." *Orange Lake,* 21 F.3d at 1217 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Additionally, we review *de novo* the questions of standing and mootness because they are questions of law.

## V. Standing

Article III of the Constitution provides that "[t]he judicial Power shall extend to *all* Cases ... arising under this Constitution [or] the Laws of the United States." U.S. Const. art. III § 2 (emphasis added). Accordingly, the Supreme Court has interpreted this affirmative grant of jurisdiction to all cases arising under the Constitution or federal statutes as a limitation of federal court jurisdiction to *cases. Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) ("Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies' ").

To determine just what constitutes a "Case" arising under the Constitution or laws of the United States, the Supreme Court has developed a number of doctrines. Foremost among these is the doctrine of standing. This doctrine delineates the plaintiff's ability "to invoke the power of a federal court." *Id.*

Courts have divided the question of standing into a two-tiered inquiry which includes (1) three constitutional minima and (2) prudential considerations which may limit judicial review in some circumstances. *E.g., Jackson v. Okaloosa County,* 21 F.3d 1531, 1536 (11th Cir.1994) (explicating the body of caselaw on the question of standing). The three constitutional minima are that: (1) the litigant suffered a personal injury or threat of injury; (2) the injury fairly can be traced to the action challenged; and (3) the injury is likely to be redressed by the requested relief. *E.g., Northeastern Florida Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* —— U.S. ——, ———–——, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993); *Valley Forge Christian College v. Americans United for Separation of Church*

*and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Amsat Cable v. Cablevision of Connecticut,* 6 F.3d 867, 873 (2d Cir.1993); *Heldman v. Sobol,* 962 F.2d 148, 154 (2d Cir.1992); *Lamont v. Woods,* 948 F.2d 825, 829 (2d Cir.1991). These constitutional minima are assessed as of the time the lawsuit is brought. *Lujan v. Defenders of Wildlife,* —— U.S. ——, —— n. 4, 112 S.Ct. 2130, 2141 n. 4, 119 L.Ed.2d 351 (1992) (citing *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 830, 109 S.Ct. 2218, 2221, 104 L.Ed.2d 893 (1989)); *Robidoux v. Celani,* 987 F.2d 931, 938 (2d Cir. 1993).

In *Jacksonville,* the Supreme Court laid out what it means by each of these three constitutional minima. The injury minimum signifies "an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual and imminent, not conjectural or hypothetical.' " *Jacksonville,* —— U.S. at ——, 113 S.Ct. at 2302 (quoting *Lujan,* —— U.S. at ——, 112 S.Ct. at 2136 (citations, footnote, and internal quotation marks omitted)). The causation minimum signifies a "causal relationship between the injury and the challenged conduct," that is, "the injury 'fairly can be traced to the challenged action of the defendant,' and has not resulted 'from the independent action of some third party not before the court.' " *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). The redressability minimum ensures that the " 'prospect of obtaining relief from the injury as a result of a favorable ruling' is not 'too speculative.' " *Id.* (quoting *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3325).

"If these constitutional minima are satisfied, a court may nevertheless deny standing for prudential reasons." *Lamont,* 948 F.2d at 829. However, congressional legislation may expand standing to the full extent permitted by Article III, thereby proscribing judicial exercise of prudential considerations. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

As already apparent, this case presents a myriad of claims against federal, state, and local government officials as well as against various federal and state housing authorities. These claims include both constitutional claims and statutory claims under Title VI, Title VIII, and the United States Housing Act. For federal courts to have jurisdiction over any of these claims, only one named plaintiff need have standing with respect to each claim. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 263–64, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

Nonetheless, the district court held that none of the named plaintiffs had alleged facts sufficient to establish the injury in fact minima of the Article III test. *Comer v. Kemp,* 824 F.Supp. at 1120. The court also held that even if the plaintiffs did allege facts sufficient to establish injury and causation, they have not met the standard to be heard on a claim for injunctive or declaratory relief. *Id.* We now hold that the RAC and Belmont plaintiffs do have standing to bring suit against their respective defendants and vacate the judgment of the district court dismissing the RAC and Belmont Complaints. We take each complaint in turn.

## A. RAC Complaint

We examine the question of the RAC plaintiffs' Article III standing first with respect to the statutory claims and then with respect to the constitutional claims.

### 1. Statutory Standing Under the FHA

■ The RAC plaintiffs allege that RAC's policies, practices, and procedures have created and continue to perpetuate racial discrimination within the federal Section 8 certificate program. Specifically, the RAC plaintiffs allege that the Section 8 program as administered in Buffalo is racially discriminatory because the RAC unlawfully restricts the use of Section 8 certificates to the City of Buffalo (the "Section 8 Claim") and fails to conduct adequate affirmative outreach to economically disadvantaged minorities as required by 24 C.F.R. § 882.207 (the "Outreach Claim"). RAC Complaint, ¶¶ 70–80. Accordingly, the RAC plaintiffs argue that

RAC's policies, practices, and procedures impede economically disadvantaged minorities from moving to and residing in suburban neighborhoods surrounding the City of Buffalo. RAC Complaint, ¶¶ 1–3.

RAC argues that its Section 8 program does not restrict participants to the City of Buffalo. Rather, RAC contends that its policy is to give any certificate holder, who wishes to live outside the city limits, a voucher, *subject to availability,* which could be used in any PHA operating a voucher program, Belmont, for instance. Fanelli Aff. at 6, ¶¶ 20–23; RAC's Answer To First Amended Complaint, *Comer v. Kemp,* No. 89–1556 (W.D.N.Y. Sept. 5, 1990) at 6, ¶ 29. If no vouchers were available, then RAC would place the certificate holder on a waiting list and would issue a voucher as soon as one with the correct number of bedrooms became available. Fanelli Aff. at 6–7, ¶ 22. Finally, RAC contends that this entire claim has been mooted by a July 2, 1990, HUD notice to all Section 8 PHAs directing them to advise certificate holders that they may move not only within the same MSA of the PHA but into a contiguous MSA. On RAC's motion to dismiss, the district court found (1) that RAC was in compliance with Section 8 rules and regulations because "by August 1990, certificates issued by RAC could be used anywhere." *Comer v. Kemp,* 824 F.Supp. at 1123, and (2) "RAC's outreach efforts [are] in compliance with HUD's outreach regulations, and that the RAC plaintiffs were well acquainted with RAC's programs before initiating this suit and suffer no palpable injury as a result of RAC's outreach efforts." *Id.* at 1128.

■ To the extent that the plaintiffs' claims invoke the FHA, we need only examine the constitutional minima of injury, causation, and redressability because

"Congress intended standing ... to extend to the full limits of Art. III" and ... the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section. Thus the sole requirement for standing to sue under [the FHA] is the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he [or she]

has suffered "a distinct and palpable injury."

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (quoting *Gladstone*, 441 U.S. at 103 n. 9, 99 S.Ct. at 1609–10 n. 9, and *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). "In light of the clear congressional purpose in enacting the [FHA], and the broad definition of 'person aggrieved' ... 'person[s] who claim[ ] to have been injured by a discriminatory housing practice,' ha[ve] standing to litigate violations of the [FHA].... Congress ha[s] given residents of housing facilities covered by the statute an actionable right to be free from the adverse consequences to them of racially discriminatory practices directed at and immediately harmful to others." *Warth*, 422 U.S. at 512–13, 95 S.Ct. at 2212–13;[3] *see also Ragin v. Harry Macklow Real Estate Co.*, 6 F.3d 898, 904 (2d Cir.1993) ("Given the private attorney general provision in section 813(a) of the [FHA] and the Supreme Court's holding in *Havens Realty*," newspaper readers had standing to challenge newspaper ad that excluded African–American models); *Michigan Protection and Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 344 (6th Cir.1994) ("Congress intended [FHA] § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class.... When Congress amended [FHA] § 3604(f) in 1988, it intended the section to reach not only actors who were directly involved in the real estate business, but also actors who directly affect the availability of housing, such as state or local governments") (citing H.R.Rep. No. 100–711, 100th Cong., 2d Sess. 22 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2183) (other citations omitted); *Growth Horizons, Inc. v. Delaware County, Pa.*, 983 F.2d 1277, 1282 n. 6 (3rd Cir.1993) (citing *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 208–12, 93 S.Ct. 364, 366–68, 34 L.Ed.2d 415 (1972) and *Gladstone*, 441 U.S. at 102–09, 99 S.Ct. at 1609–13); *South–Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 878 (7th Cir.1991) ("the sole requirement for standing to sue under [the FHA] is the Art. III minima"), *cert. denied*, —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992).

In summary, with respect to the FHA claims, we accord the RAC plaintiffs, as well as the Belmont plaintiffs, the broadest possible grounds for standing.

Now, turning to the merits of the arguments, neither RAC's contentions nor the district court's reasoning meet the plaintiffs' challenge. Each named plaintiff, Jessie Comer, Hazel Grimes, Yvonne Primm, and Felicia Stokes, points to several legally protected interests that have been invaded, and each alleges that the RAC defendants have invaded these legally protected interests. For example, each plaintiff alleges that RAC violates the FHA by failing to administer RAC housing in a non-discriminatory manner. Under the Civil Rights Act of 1964, "[n]o person in the United States shall, on the ground of race ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Each named plaintiff alleges that she is a low-income black resident of a public housing project in Buffalo. Each alleges that she was eligible for and applied for RAC housing. Primm and Stokes allege that they were specifically told that they could not use their Section 8 voucher or certificate outside the City of Buffalo. Deposition of Yvonne Primm at 49, *Comer v. Kemp*, No. 89–1556 (RAC) (Sept. 6, 1990) ("Primm Deposition"); Deposition of Felicia Stokes at 9, 35, *Comer v. Kemp*, No. 89–1556 (RAC) (Sept. 6, 1990) ("Stokes Deposition"). Comer testified that RAC gave her little information about RAC housing, and "[w]hat little I heard of, I picked it up from friends." Deposition of Jessie Comer at 42, *Comer v. Kemp*, No. 89–1556 (RAC) (Sept. 5, 1990) ("J. Comer Deposition of 9/5/90"). Primm and Comer allege that they were given a Section 8 fact sheet which gives no information that the voucher or certificate could be used outside the City

---

3. Section 812, previously codified at 42 U.S.C. § 3612 and referred to in *Warth*, has been repealed and replaced by 42 U.S.C. § 3613(a).

of Buffalo. In fact, the second paragraph of the fact sheet plainly states: "The purpose of these [Section 8] programs is to ensure decent, safe, and sanitary housing in privately owned buildings *in the City of Buffalo.*" Undated RAC Section 8 Fact Sheet, Brief in Opposition of Motion to Dismiss, Exhibit P, *Comer v. Kemp,* No. 89–1556 (W.D.N.Y. Jan. 9, 1991) (emphasis added). Comer and Grimes allege that they were given no information at all in violation of HUD regulation, 24 C.F.R. § 882.207 (RAC failed to "make known to the public, through publication in a newspaper of general circulation as well as through minority media and other suitable means, the availability and nature of housing assistance for lower-income families"). In fact, Grimes was denied housing because she was purportedly ineligible. Finally each named plaintiff demands injunctive relief; assuming that the RAC plaintiffs can prove their case, the court can provide such relief. Therefore these claims are redressable.

In short, each named plaintiff has standing to bring suit against the RAC defendants pursuant to the FHA because, according to each named plaintiff, the RAC, a "program ... receiving Federal financial assistance," administers its certificate system and waiting list in a way that allegedly (1) has denied Comer, Grimes, Primm, and Stokes the benefits of the Section 8 program, (2) has excluded Comer, Grimes, Primm and Stokes from participation in these programs, and (3) has subjected Comer, Grimes, Primm, and Stokes to racial discrimination in violation of the FHA and applicable civil rights laws. Thus, each named plaintiff has alleged facts that demonstrate that the RAC defendants have invaded a legally protected interest and that such injury is redressable by injunctive relief. For similar reasons, we find that the named plaintiffs have standing to bring suit on their CDBG claim.

■ Furthermore, the claims are not mooted by the introduction of a July 2, 1990, HUD notice to all Section 8 PHAs directing them to advise certificate holders that they may move within the same MSA of the PHA or a contiguous MSA. If RAC fails to communicate this information to the economically disadvantaged minority certificate holders, then RAC still is in violation of civil rights laws. *Havens,* 455 U.S. at 372–74, 102 S.Ct. at 1120–22 (holding that a black "tester," posing as a renter to collect evidence of racial steering practices in housing, had standing to seek damages because the FHA conferred the legal right to be given truthful information about housing availability); *see also Lujan,* —— U.S. at —— n. 4, 112 S.Ct. at 2141 n. 4; *Robidoux,* 987 F.2d at 938; *infra* section VII of this opinion (dealing with mootness).

In summary, we hold that Jessie Comer, Hazel Grimes, Yvonne Primm and Felicia Stokes have standing to bring their statutory claims against the RAC defendants.

### 2. Constitutional Standing

■ The case for standing on the constitutional claims is more difficult only because we must consider not only the three constitutional minima but also any prudential reasons for denying standing. We now hold that each RAC plaintiff has standing to sue on the constitutional claims as well.[4]

Take Felicia Stokes, for example. Stokes is an African–American woman resident of federally subsidized rental housing administered by RAC. She alleges that she was deprived of the opportunity to obtain RAC housing in the suburbs. According to her deposition, she first heard about RAC housing assistance sometime in 1988. Stokes Deposition at 7. On April 28, 1989, she applied for a Section 8 subsidy. She received the subsidy after only two months because a fire in her apartment involuntarily displaced her, qualifying her for a federal subsidy. At a housing orientation session, RAC agents instructed her that she could use her certificate only within the city limits, and not in the suburbs. RAC agents did not advise her of the voucher program which could be used outside the City. Stokes Deposition at 34–

---

**4.** With respect to the substantive standards, the plaintiffs' constitutional claims also require proof of intentional discrimination, but their statutory claims can succeed by showing disparate impact, which is assessed in accordance with "Title VII's burden-shifting analysis." *Orange Lake,* 21 F.3d at 1227 (explicating the difference between the constitutional and statutory standards).

35. Although she attended several other Section 8 briefing sessions, no administrator ever gave her any information of any programs for which she might be eligible outside the City. Stokes Deposition at 35–36.

Thus, Stokes' claim is two-fold: First, the government, by deliberately failing to provide a free flow of housing information, has erected a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities. *See Jacksonville,* —— U.S. at ——, 113 S.Ct. at 2303. Second, regardless of whether RAC was in compliance with Section 8 rules and regulations when HUD issued its July 2, 1990, notice that RAC certificate holders were no longer restricted to the City of Buffalo, *see Comer v. Kemp,* 824 F.Supp. at 1123, a fact irrelevant to the question of standing, *see Lujan,* —— U.S. at —— n. 4, 112 S.Ct. at 2141 n. 4, the lack of information given to economically disadvantaged minority voucher and certificate holders was intentional and harmed those individuals who subsequently failed to find housing in the suburbs. Thus, Stokes not only has two separate and distinct claims, i.e., a Section 8 Claim and an Outreach Claim, but also two claims which are inextricably interwoven.

The district court found that there was no injury in fact to Felicia Stokes because although Stokes " 'would have liked to' " live outside the City, she no longer wished to move to the suburbs. *Comer v. Kemp,* 824 F.Supp. at 1125–26; Stokes Deposition at 17. Based on this portion of Stokes' deposition testimony, the district court summarily dismissed her claim for lack of standing because, according to the court, Stokes "testified that she is content with the treatment which she received from RAC through the years of her dealings and has no current desire to move outside the City of Buffalo." *Comer v. Kemp,* 824 F.Supp. at 1129. The district court's point is this: Felicia Stokes does not have standing to pursue this litigation because Suburban RAC housing was and is available to Felicia Stokes. Therefore, Stokes has not suffered an injury.

To make this point, the district court has cleaved the Section 8 claim from the Outreach Claim. In the cleavage, the theory of the case seeps through the cracks, thereby facilitating the dismissal of the case.

We are not persuaded by this reasoning. First, as we have stated repeatedly, the question whether Stokes has a current desire to live outside the City of Buffalo is irrelevant because standing is measured as of the time the suit is brought. *Lujan,* —— U.S. at —— n. 4, 112 S.Ct. at 2141 n. 4; *Robidoux,* 987 F.2d at 938.

Putting aside the question of timing, we now hold that the RAC plaintiffs had standing to bring their constitutional claims. Assuming, for purposes of this appeal, the truth of the allegations against RAC, this is the story of Felicia Stokes. She applied for public housing, but received only the information that the administrators chose to share with her. She alleges that she did not know that she could use her voucher to move outside the city limits. Furthermore, Stokes contends that RAC rules and regulations, *in their administration,* violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities. *See Jacksonville,* —— U.S. at ——, 113 S.Ct. at 2303. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* (citing *Turner v. Fouche,* 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970)). And, this injury is directly traceable to the actions of the RAC defendants.

Our examination of the other plaintiffs, Comer, Grimes and Primm, shows similar problems with the administration of their housing applications. At every turn, HUD and RAC agents have either failed to give any information at all, as in the case of Comer and Grimes, or gave incomplete information about housing availability as in the cases of Primm and Stokes. Furthermore, each of the named plaintiffs demands injunctive relief. As we stated earlier, if the plaintiffs prevail on their claims, the court can shape such relief. Therefore, the RAC plaintiffs also meet the redressability minima.

Finally, the defendants do not provide and we cannot find any prudential reasons for denying standing to these plaintiffs. Therefore, we hold that the RAC plaintiffs do have standing to bring this case on their equal protection claims. For similar reasons, we find that the RAC plaintiffs have standing to bring suit on their other constitutional claims as well. We therefore vacate the judgment of the district court with respect to the RAC Complaint.

## B. Belmont Complaint

The Belmont plaintiffs allege that (1) Belmont's local preference impedes persons who live in the City of Buffalo, which has a higher percentage minority population than the suburbs, from obtaining rental assistance available under Belmont's program, thereby giving subsidies to a disproportionate number of white suburban residents and workers ahead of minority city dwellers, and (2) the suburban consortium fails to conduct adequate affirmative action outreach to minority households within the City of Buffalo. Belmont Complaint, ¶¶ 1–3, ¶¶ 47–64 (preference claim), ¶¶ 65–74 (outreach claim).

The district court never held that Belmont's local preference policy conforms either to applicable civil rights laws or to the Constitution. Instead, the district court held that neither Jessie Comer nor Jewel Culverhouse, the two minority individuals who brought suit against Belmont, have standing because neither Comer nor Culverhouse can show injury in fact. The argument is as follows: Given the limited resources available for Section 8 assistance, "a successful Belmont applicant must qualify for a federal preference ... to have a realistic prospect for obtaining Section 8 assistance." *Comer v. Kemp*, 824 F.Supp. at 1122. Neither Comer nor Culverhouse can "demonstrate that they qualify, or that there is any prospect of future qualification to be on the two lists which offer a reasonable probability of reaching the top." *Id.* Therefore, neither Comer nor Culverhouse has standing to bring suit against Belmont. Belmont's argument on appeal is a variation of the court's holding below. Brief for HUD–Federal Appellees at 33–34.

We are not persuaded by these arguments. Assuming that neither Comer nor Culverhouse qualifies for a federal preference, then, under current administration by Belmont, neither plaintiff has much of a chance of reaching the top of the waiting list. Nevertheless, the Belmont defendants cannot defeat the legal challenge presented by the Belmont plaintiffs with an appeal to the Belmont program as currently administered.

■ The U.S. Housing Act provides that under the appropriate circumstances, HUD may assist a family which does not qualify for a federal preference, before it assists a family which does qualify for a federal preference, but which does not live in the jurisdiction at the time of application. 42 U.S.C. § 1437f(o). The local preference is subject to various limitations including that its administration must be consistent with the United States Constitution and with civil rights laws. 42 U.S.C. § 3604, 42 U.S.C. § 2000d. Furthermore, according to the plain language of the HCDA itself, as conditions for receiving federal CDBG funds, the grantee must (1) "affirmatively further fair housing," 42 U.S.C. § 5304(b)(2); (2) administer the grant in conformance with 42 U.S.C. §§ 2000a to 2000a–6 (public accommodations); 42 U.S.C. §§ 2000d to 2000d–7 (federally-assisted programs); and the FHA, 42 U.S.C. §§ 3601–3631; and (3) submit an annual performance report for HUD's review, 42 U.S.C. § 5304(e). This report must address the CDBG recipient's compliance with Title VI and Title VIII, and the recipient's efforts at meeting the statutory obligations to promote fair housing under 42 U.S.C. § 5304(b)(2). Once again, the administration of the funds must be consistent with the Constitution as well as applicable civil rights laws. In short, Belmont officials must administer the local preference and handle CDBG funds in conformance with the Constitution and applicable civil rights laws.

Having established the contours of the arguments surrounding the question of the Belmont plaintiffs' standing to sue the Belmont defendants, we now examine this question first with respect to the constitutional claims, and then with respect to the statutory claims of the Belmont plaintiffs. We limit our comments to standing on the local preference

because our analysis of the Belmont plaintiffs' standing to sue the Belmont defendants on the outreach claim would be substantially similar to our analysis on the RAC plaintiffs' standing to sue on these claims.

### 1. Constitutional Standing

■ A government harms minority individuals, and violates the Equal Protection Clause, accordingly:

When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he [or she] would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Jacksonville,* —— U.S. at ——, 113 S.Ct. at 2303. Thus, under *Jacksonville,* to show Article III standing for constitutionally-protected equal protection claims, a plaintiff must allege that (1) there exists a reasonable likelihood that the plaintiff is in the disadvantaged group, (2) there exists a government-erected barrier, and (3) the barrier causes members of one group to be treated differently from members of the other group. *See, e.g., Turner v. Fouche,* 396 U.S. at 362, 90 S.Ct. at 541 ("We may assume that the [plaintiffs] have no right to be appointed to the ... board of education. But [they] do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications"); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) ("The [minority set-aside program] denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race").

■ In this case, the government-erected barrier is the local preference, which, the Belmont plaintiffs allege, effectively blocks African–American residents of the City from moving to the suburbs. The Belmont plaintiffs support this argument with statistics that demonstrate that while there are many blacks who live within the city limits, many less live in suburban Buffalo. The Belmont plaintiffs also alleged that, as of January 1990, minority families held only three per cent of the over 2000 certificates and vouchers issued by the suburban Belmont Section 8 Program, although 21 per cent of the families on Belmont's waiting list of over 3,800 households were minority families. Thus, the erection and application of the local preference acts as a proxy for race which services as an instrument to deny minority individuals the opportunity to be considered for suburban housing. While a local preference may be neither *per se* unconstitutional, nor *per se* unfair, where a government erects a local preference that has the effect of filtering only a small percentage of minorities to the locally preferred area, such government action is suspect to being a proxy for race and therefore a barrier to racial minorities who wish to integrate into suburban life. This allegation is sufficient to show injury and causation for purposes of Article III standing on the constitutional claims.

The Belmont defendants argue that "the local preference used by Belmont operates in a race-neutral fashion [because] it gives both white *and* minority residents and workers in the consortium communities subsidies ahead of both white and minority Buffalo residents." Brief for HUD–Appellees at 31 n. 13 (HUD's emphasis). This argument cannot overcome the constitutional challenge.

Taking the well-pleaded allegations of the Belmont plaintiffs as true, while the local preference may be neutral on its face, the preference impermissibly classifies according to race, thereby transgressing the constitutionally protected rights of blacks. The Belmont plaintiffs may constitutionally challenge a state action on the grounds that it constitutes a device designed to classify individuals as a means to serve an impermissible end. *See, e.g., Orange Lake,* 21 F.3d at 1225 (citing Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law,* 2d ed., § 18.4 (1982)). As we explain above, the Belmont plaintiffs allege that the local preference is such a device.

The Belmont defendants also contend that neither named plaintiff has a federal preference. Therefore, as a practical matter, neither would receive housing assistance and therefore neither has standing to sue. This situation is analogous to the one presented to the Supreme Court in *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), "where a twice-rejected white male applicant [to medical school claimed that the University's] admissions program, which reserved 16 of the 100 places in [each] entering class for minority [candidates], was inconsistent with the Equal Protection Clause." *Jacksonville*, —— U.S. at ——, 113 S.Ct. at 2302. Several amici curiae argued that Bakke lacked standing to challenge the program because he would not have been admitted anyway. Justice Powell, writing for a majority on this point, explained that "even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing," because Bakke's injury was the "University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race." *Bakke*, 438 U.S. at 280–81 n. 14, 98 S.Ct. at 2743 n. 14 (opinion of Powell, J.). As stated above, "[t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Jacksonville*, —— U.S. at ——, 113 S.Ct. at 2303.

Similarly, the injury to the Belmont plaintiffs cannot be defeated by showing that, as a practical matter, the plaintiffs would never receive housing assistance anyway. The injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete for suburban housing on an equal footing with the local residents. *See Trafficante*, 409 U.S. at 208–12, 93 S.Ct. at 366–68 (holding that a white and a black tenant had standing to challenge their landlord's acts of discriminating against non-white rental applicants); *Havens*, 455 U.S. at 372–74, 102 S.Ct. at 1121–22.

As with RAC, it is not enough to demonstrate standing on the strength of a hypothetical plaintiff. The Belmont plaintiffs must show that there is some link between the challenged government action, and their particular injury. They must also show that such injury is redressable. We find that both named plaintiffs allege facts sufficient to demonstrate the constitutional minima. We also find that there are no prudential reasons for denying standing and therefore conclude that both named plaintiffs have standing to sue the Belmont defendants on the equal protection claims.

Take Jessie Comer, for instance. Jessie Comer is an African–American single mother of two children who works approximately three days per week as a substitute teacher in the Buffalo public schools. Deposition of Jessie Comer at 7, *Comer v. Kemp*, No. 89–1556 (Belmont) (Sept. 20, 1990) ("J. Comer Deposition of 9/20/90"). Until recently, she had been a resident of BMHA housing. She has applied to both RAC and Belmont for a housing subsidy, but has not yet received one. Comer contends that she is entitled to a federal preference. Although the appellees contend that they have provided evidence sufficient to demonstrate that Comer is not entitled to a federal preference and therefore that there is no genuine issue of fact on this point, we disagree. We need not elaborate on this point, however, because as we stated above, the plaintiffs' lack of a federal preference does not defeat their standing to challenge the constitutionality of the local preference. *See Bakke*, 438 U.S. at 280–81 n. 14, 98 S.Ct. at 2743 n. 14. Comer alleges that, although she knew about Belmont's suburban housing program since the late 1980s, she believed that an applicant had to live outside the city limits to obtain a Belmont subsidy. When she learned otherwise, she applied for a Belmont subsidy in July 1990. Huckabone Affidavit, Exhibit B; J. Comer Deposition of 9/20/90, at 20. Comer also alleges that white suburban applicants who applied for a Belmont subsidy after July 1990, such as Ann Palmer, have already received their subsidy. *See* Brief for Appellants, Addendum F; Plaintiffs Response To Belmont's Opposition To Preliminary Injunction Motion, Exhibit D, *Comer v. Kemp*, No. 89–1556 (Belmont) (letter of 7/9/1991 from Belmont to Palmer stating that she had applied for a subsidy and was placed on Belmont's waiting list as of June 27, 1991, and letter of 7/13/1992 from

Belmont to Palmer informing her that she had received a subsidy). At this time, Comer is homeless, although living with a relative, and waiting for affordable housing to become available. Culverhouse alleges similar facts. She too is an African–American single mother of three children. Culverhouse and her children lived in BMHA housing for about two years, then, for a short time, they lived at a battered women's shelter, before moving to a privately owned, unsubsidized house. When her landlord sold this house in 1989, Culverhouse and her children moved to a Salvation Army Shelter. At this time, she applied for both BMHA and Belmont suburban housing. However,

> when I filled out my application at that time, the lady told me because I was not already living in the suburban area, they could not help me.... If the Salvation Army was located in Amherst or Tonawanda, it was a different story.
>
> ....
>
> The receptionist took a look at the application and handed it back because she said that they were doing the suburban areas and I did not live in a suburban area and that I could not be helped, anyway. So, it was like a waste of time to submit the application because I was living right around the corner from [the Belmont office] in the Salvation Army Shelter.

Deposition of Jewel Culverhouse at 19–20, 25, *Comer v. Kemp,* No. 89–1556 (Belmont) (Oct. 11, 1990) ("Culverhouse Deposition"). Culverhouse and her children now live in the overwhelmingly minority-occupied BMHA Kenfield Apartments.

In summary, we hold that the named plaintiffs have standing to sue the Belmont defendants on the equal protection claims. For substantially similar reasons, we hold that the named plaintiffs also have standing to sue the Belmont plaintiffs on the other constitutional claims as well. We now turn to an examination of the statutory claims.

### 2. Statutory Standing

■ Although the U.S. Housing Act, by its terms, does permit a local preference, such preference is subject to various limitations including that its administration must be consistent with the Constitution and civil rights laws. *See, e.g.,* 42 U.S.C. § 5304(b)(2); 42 U.S.C. §§ 2000a to 2000a–6 (public accommodations); 42 U.S.C. §§ 2000d to 2000d–7; 42 U.S.C. §§ 3601–3631. Therefore, the application of the local preference is null and void to the extent that the local preference is inconsistent with the Constitution, as we demonstrated *supra,* or any of these acts. *See Orange Lake,* 21 F.3d at 1227 (explicating the difference between the constitutional and statutory standards in this respect). The Belmont plaintiffs allege that Belmont's application of the local preference promotes segregation. If true, then the administration of Belmont's housing program is in violation of its own terms. Therefore, all that any specific plaintiff must show is that (1) the application of the local residency preference has a disparate impact on minority residents of the City of Buffalo, (2) he or she is a member of the class harmed by the application of the local residency preference that is being denied the benefits accorded under the U.S. Housing Act because of Belmont's application of the local preference and (3) he or she applied for and was denied housing. Comer and Culverhouse have alleged these facts and therefore have Article III standing to bring this lawsuit on the statutory claims. We need not address the question of prudential concerns as they do not apply to standing under the FHA. For substantially similar reasons, Comer and Culverhouse have standing to pursue their claims under the CDBG as well.

In short, we hold that the Belmont plaintiffs do have standing to bring this case and reverse the judgment of the district court with respect to the RAC and Belmont Complaints.

### VI. Class Certification

■ Normally, we would analyze the question of mootness before reviewing the question of class certification. But, for reasons that become clear, the issues of mootness and class certification are inextricably interwoven in this case. Before we can determine whether this case is moot, we must

determine whether or not we are dealing with a class action suit.

The various plaintiffs commenced this action on behalf of a class of all named plaintiffs, and on behalf of all other persons similarly situated. Fed.R.Civ.P. 23(a) and (b)(2). The RAC plaintiffs seek injunctive relief on behalf of a sub-class of all minority Buffalo residents who are financially eligible for Section 8 Existing Housing subsidies and who: (a) have applied for an RAC subsidy; (b) would apply if they were notified of the availability of the program; or (c) will apply for an RAC subsidy in the future. The Belmont plaintiffs seek injunctive relief on behalf of a sub-class of all minority Buffalo residents who are financially eligible for Section 8 Existing Housing subsidies and (a) who have applied for a Belmont subsidy; (b) who would apply if they were notified of the availability of the program; or (c) who will apply for a Belmont subsidy in the future. The BMHA plaintiffs seek injunctive relief on behalf of a sub-class of all former, current and future residents of and applicants for housing in BMHA administered public housing projects.

The district court dismissed the plaintiffs' claims on standing and mootness grounds. As a result, the court denied the plaintiffs' motions for class certification without addressing whether the putative representatives met the requirements for class certification. Therefore, we must review these questions anew. See Robidoux, 987 F.2d at 935.

To obtain class certification, the plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Additionally, the plaintiffs must satisfy one of three criteria set forth in Rule 23(b). In this case, the plaintiffs predicate class certification upon a showing that the RAC and Belmont defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

The defendants do not present, and we cannot find, any arguments that the plaintiffs do not satisfy the requirements set forth in Rules 23(a), and (b)(2). Indeed, pattern of racial discrimination cases for injunctions against state or local officials are the "paradigm" of Fed.R.Civ.P. 23(b)(2) class action cases. 3B J. Moore & John E. Kennedy, *Moore's Federal Practice* ¶ 23.40[1], at 258 (2d ed. 1993). Instead, the thrust of the defendants' argument is that a class action may not be prosecuted unless the named plaintiffs have standing. The defendants' reliance on *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), is misplaced. The *O'Shea* plaintiffs could not establish that they had alleged a concrete and particularized injury-in-fact at the onset of their lawsuit. Therefore, the *O'Shea* plaintiffs never had standing to bring a class action suit against the defendants, and therefore, according to the defendants, "[t]here was no class certification ... as the complaint was dismissed on grounds which did not require that determination to be made." *O'Shea*, 414 U.S. at 494, n. 3, 94 S.Ct. at 675, n. 3.

In this case, as we earlier held, the RAC and the Belmont plaintiffs did have standing to bring this suit at the commencement of this suit. Furthermore, these plaintiffs satisfied the requisite conditions of class certification at the time the plaintiffs first filed a complaint and at the time the court ordered the plaintiffs to file three amended complaints; they also satisfy these conditions as of today. Specifically, the plaintiffs satisfy the requirements of Rule 23(b)(2) because the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to minority residents of Buffalo. The plaintiffs also satisfy the requirements set forth in Rule 23(a). First, there is no dispute that each proposed sub-class satisfies the numerosity requirement of Rule 23(a)(1). Second, the questions of law, which predominantly focus on whether the behavior of the defendants violated the FHA and the Fourteenth and Fifth Amend-

ments of the Constitution, are, by necessity, common to the class because they do not depend on the plaintiff-variable but on the defendants, who are a constant. Furthermore, many of the questions of fact are common to the class because again, the class members all come from similar socio-economic and racial backgrounds. Other than the variables which go into the actual composition of the class, which as we have just noted are quite similar, the lawsuit focuses on the behavior of the defendants and not that of the plaintiffs. Third, the claims of the representative parties are typical of the class. The claims of the named plaintiffs are that they are financially eligible minorities who applied for federally-subsidized housing and were not told about certain programs. The variation in facts include such factors as when they applied for housing assistance and to whom they spoke. Thus, "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux*, 987 F.2d at 936; *see also* 7A Charles A. Wright, *et al., Federal Practice and Procedure* § 1764, at 243 & n. 18 (1986 & Supp.1994). Finally, we find that the representative parties will fairly and adequately protect the interests of the class. Even a cursory examination of the record shows that the representative parties have vigorously prosecuted this law suit despite the fact that their claims have ultimately been rejected for lack of standing. We now uphold their standing and instruct the district court to certify the RAC and Belmont sub-classes.

It is unfortunate that the district court took so long to rule on the question of class certification only to hold *not* that the plaintiffs have not demonstrated that they meet the necessary conditions for class certification, *but* that the claims have become moot. We note that housing discrimination suits of this type are acutely susceptible to mootness because of the fluid composition of the public housing population. Thus, while the harm remains constant, those who suffer from the harm often change identity. The plaintiffs obviously were well aware of this fact and acted promptly to prosecute this suit. The plaintiffs filed a motion for class certification

on February 2, 1990, less than two months after filing their complaint. The district court never ruled on this motion, but ordered the plaintiffs to separate their action into three amended complaints. On July 23, 1990, just thirteen days after being so ordered, the various plaintiffs filed the three amended complaints. On November 9, 1990, the RAC, Belmont, and BMHA defendants filed motions to dismiss their respective complaints. The main grounds upon which the defendants predicated their motions to dismiss were standing and the lack of conditions necessary for class certification. Then, two years later, on August 19, 1993, the district court dismissed the complaints on standing and mootness grounds.

■ Given the circumstances leading to the dismissal of this suit and for reasons which become apparent in our discussion of mootness *infra*, we feel compelled to state that, on remand, the district court has the power to decide the merits of these claims although the particular claim of the named plaintiffs may themselves become "moot" at some point in the future. " '[T]he termination of a class representative's claim does not moot the claims of the unnamed members of the class.' " *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52, 111 S.Ct. 1661, 1667–68, 114 L.Ed.2d 49 (1991) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110–11, n. 11, 95 S.Ct. 854, 861 n. 11, 43 L.Ed.2d 54 (1975) (citing *Schall v. Martin*, 467 U.S. 253, 256 n. 3, 104 S.Ct. 2403, 2405 n. 3, 81 L.Ed.2d 207 (1984))). In fact, it is often the invocation of class certification that preserves the merits of the controversy for appellate review. *McLaughlin*, 500 U.S. at 51–52, 111 S.Ct. at 1667–68; *see also Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir.1993) (controversy moot where district court ordered university to give varsity status to women's hockey club, and all the non-class-certified, women-litigants graduated by time appeal was heard).

Having certified these claims, we now turn to a more in-depth examination of the question of mootness.

## VII. Mootness

While the standing doctrine evaluates a litigant's personal stake at the onset of a

case, *Lujan,* —— U.S. at —— n. 4, 112 S.Ct. at 2141 n. 4; *Robidoux,* 987 F.2d at 938, "the mootness doctrine ensures that the litigant's interest in the outcome continues throughout the life of the lawsuit." *Cook v. Colgate Univ.,* 992 F.2d at 19 (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396–97, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980); *Etuk v. Slattery,* 936 F.2d 1433, 1441 (2d Cir.1991)). In general, "a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969) (internal quotation marks omitted)).

The mootness doctrine is riddled with exceptions, however. Among the exceptions pertinent to this case are the "'voluntary cessation'" doctrine, *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383; *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (defendants voluntarily ceased allegedly illegal conduct; not moot because there is no expectation that the defendants will not reinitiate the challenged conduct), and the "capable of repetition" doctrine, *Sosna v. Iowa,* 419 U.S. 393, 399–400, 95 S.Ct. 553, 557–58, 42 L.Ed.2d 532 (1975) (Iowa state court dismissed wife's petition for divorce because she failed to meet state's one-year residency requirement; not moot when wife met residency requirement because the problem to potential divorcees posed by the residency requirement was "capable of repetition, yet evading review"); *Dunn v. Blumstein,* 405 U.S. 330, 333 n. 2, 92 S.Ct. 995, 998 n. 2, 31 L.Ed.2d 274 (1972) (challenge against Tennessee law barring persons from registering to vote unless, at the time of the next election, they resided in the State for at least one year and in a particular county for at least three months; not moot when litigant became eligible to vote); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712–13, 35 L.Ed.2d 147 (1973) (pregnant woman challenged anti-abortion statute; not moot when pregnancy terminated); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *see also DeFunis v. Odegaard,* 416 U.S. 312, 319, 94 S.Ct. 1704, 1707, 40 L.Ed.2d 164 (1974) (per curiam) (holding that equal protection claim in pre-*Bakke* affirmative action suit was mooted by plaintiff's being registered in his final quarter of law school).

█ The application of these various mootness doctrines depends in part on whether the court is presented with a class action because, in general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot. *Board of Sch. Commissioners of Indianapolis v. Jacobs,* 420 U.S. 128, 129–30, 95 S.Ct. 848, 849–50, 43 L.Ed.2d 74 (1975) (per curiam). In contrast, class certification will preserve an otherwise moot claim. *McLaughlin,* 500 U.S. at 51–52, 111 S.Ct. at 1667–68. "In class actions ... courts have come to recognize that an individual plaintiff may continue to represent the interests of others even after any prospect of individual recovery has vanished." 13A Charles A. Wright, *et al., Federal Practice and Procedure* § 3533.9, at 391 (1984 & Supp.1994); *see also Gerstein,* 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11; *Sosna,* 419 U.S. at 399–400, 95 S.Ct. at 557–58; *Schall,* 467 U.S. at 256 n. 3, 104 S.Ct. at 2405 n. 3.

█ According to the defendants, this case cannot be analyzed under class action mootness doctrine because, until today, no class had been certified. The Supreme Court focused on the special problems associated with class action mootness, including the timing of class certification, in a series of cases decided in the mid–1970s: *Sosna,* 419 U.S. at 399–400, 95 S.Ct. at 557–58; *Gerstein,* 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11; *Jacobs,* 420 U.S. at 129–30, 95 S.Ct. at 849–50; *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 429–31, 96 S.Ct. 2697, 2701–02, 49 L.Ed.2d 599 (1976); *Baxter v. Palmigiano,* 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810 (1976); *Youakim v. Miller,* 425 U.S. 231, 236 n. 2, 96 S.Ct. 1399, 1402 n. 2, 47 L.Ed.2d 701 (1976); *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–61, 47 L.Ed.2d 444 (1976); *Swisher v. Brady,* 438 U.S. 204, 213–214 n. 11, 98 S.Ct. 2699, 2705 n.

11, 57 L.Ed.2d 705 (1978). Where the claims of the named plaintiffs become moot prior to class certification, there are several ways in which mootness is not had. First, an intervenor might have stepped in. *Spangler*, 427 U.S. at 430–31, 96 S.Ct. at 2702 (school desegregation case brought as class action would have been moot because all named plaintiffs graduated and no class certification; mootness avoided by presence of the United States as an intervenor); *Palmigiano*, 425 U.S. at 310 n. 1, 96 S.Ct. at 1554 n. 1 (although district court treated this prison disciplinary procedure challenge as a class action, class not certified; mootness avoided by stipulation for intervention of additional plaintiff). Second, under the appropriate circumstances, class certification may relate back to the filing of the complaint. *McLaughlin*, 500 U.S. at 52, 111 S.Ct. at 1667; *Sosna*, 419 U.S. at 402, n. 11, 95 S.Ct. at 559, n. 11. Normally, the Court has held circumstances appropriate where the claims are "'so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *McLaughlin*, 500 U.S. at 52, 111 S.Ct. at 1667 (quoting *Geraghty*, 445 U.S. at 399, 100 S.Ct. at 1210); *Gerstein*, 420 U.S. at 110 n. 11, 95 S.Ct. at 861 n. 11 (class action challenging state practice of holding for trial without probable cause hearing; named class representatives convicted prior to Supreme Court review; not moot because the nature of pretrial detention is such that "it was most unlikely" that the courts would determine the constitutional challenge prior to conviction or release; furthermore, the case was capable of repetition). In such cases, the courts permit the class certification to relate back to the filing of the complaint and hold that the plaintiffs have properly preserved the merits of the case for judicial resolution. *Swisher*, 438 U.S. at 213 n. 11, 98 S.Ct. at 2705 n. 11 (1978); *Sosna*, 419 U.S. at 402 n. 11, 95 S.Ct. at 559 n. 11.

But what if the claims are transitory in some sense, like the nature of the population of a public housing market? And, what result if, after an extended delay while a motion for class certification is pending, a suit is dismissed on standing and mootness grounds, without class certification? Given the circumstances of this case, in particular, the transitory nature of the public housing market and the court's failure to pass upon the plaintiffs' motion for class certification for over two years, we now hold that this class certification relates back to the original filing.

■■■ The defendants also argue that HUD's and RAC's voluntary cessation of the allegedly illegal conduct moots the claims of all the named and unnamed plaintiffs thereby defeating jurisdiction. Brief for Federal Appellees at 45 n. 20. The plaintiffs disagree and cite various RAC published handouts including one received by Jessie Comer in June 1991 which defines the RAC Section 8 program as a federal rental assistance program established "to ensure decent, safe, and sanitary housing in privately owned buildings *in the City of Buffalo*" (emphasis added). The RAC handout now expressly states that "Families with a Certificate are free to live anywhere in New York State with continued assistance." The plaintiffs also point out that Felicia Stokes never received notification that the geographic restriction had been removed, and Warda Thomas, an intervenor, testified that she received the misleading RAC handout in February 1991, and was advised that RAC certificate holders had to use the certificates in the City of Buffalo.

The district court held that this voluntary cessation of the defendants' earlier practice transgressing the various housing statutes mooted the RAC plaintiffs' statutory claims. *Comer v. Kemp*, 824 F.Supp. at 1123. We assume that the RAC defendants would contend that this notification moots not only the claims of the named defendants, but the claims of all unnamed plaintiffs, thereby mooting the RAC claims whether or not we use the class action line of cases. *E.g., Armstrong v. Ward*, 529 F.2d 1132 (2d Cir.1976) (class action challenging prisoner transfers mooted when new facility closed, no reasonable expectation that new facility would reopen, all prisoners retransferred; state action covered all class members and there was no expectation that the wrong would be repeated as to any of them). Accordingly, the RAC plaintiffs would be unable to rely on the

doctrine that voluntary cessation of allegedly illegal conduct does not generally moot the claims based on such conduct. *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (citing *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 897). We now hold that this notification does not moot the claims of any of the RAC plaintiffs.

██ The RAC defendants, as the parties who voluntarily ceased the allegedly illegal conduct, bear the very heavy burden of demonstrating (1) with assurance that there is no reasonable expectation that the conduct will recur, *Id.* (citing *W.T. Grant Co.,* 345 U.S. at 633, 73 S.Ct. at 897; *SEC v. Medical Committee For Human Rights,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972)), *and* (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation, *Davis,* 440 U.S. at 631, 99 S.Ct. at 1383 (citing *DeFunis,* 416 U.S. 312, 94 S.Ct. 1704 and *Indiana Employment Sec. Div. v. Burney,* 409 U.S. 540, 541–42, 93 S.Ct. 883, 884, 35 L.Ed.2d 62 (1973) (per curiam) (moot where state, which wrongfully suspended benefits, later voluntarily decided to grant full retroactive compensation; although plaintiff did obtain class certification, she apparently was the only member of the class)).[5] The RAC defendants do not meet their heavy burden. The RAC defendants have not even met the burden of showing that the allegedly illegal conduct has ceased. HUD's July 1990 notice requiring PHAs to allow certificate holders to use their subsidies anywhere within the MSA the RAC plaintiffs claim is merely an explicit statement of the federal law upon which they had been relying to sue the RAC defendants on statutory grounds. *See* Brief for Appellants at 71. Prior to the notification, the crux of the concern of the RAC plaintiffs was that RAC officials failed to communicate federal rights to minority applicants. The RAC defendants provide no assurances, other than this notification, that the same behavior has not and

will not continue. In fact, the plaintiffs provide some evidence, through the Warda Thomas and Felicia Stokes testimony and the RAC handouts, that RAC has not complied with this notification.

Even assuming the defendants had ceased the allegedly illegal conduct, we will not dismiss the claims as moot if the harm is "capable of repetition, yet evading review." *Southern Pacific,* 219 U.S. at 515, 31 S.Ct. at 283 (holding case not moot when challenged administrative order expired because ICC proceedings are continuing and their consideration ought not be defeated by short term orders "capable of repetition, yet evading review"). Otherwise, such orders effectively would create an administrative power to dispose of public and private interests without judicial review. *Id.*

The court also dismissed the claims in part because the named plaintiffs no longer wished to live either in suburban Belmont housing or RAC housing. For example, the district court found that there was no injury-in-fact to Felicia Stokes because although Stokes " 'would have liked to' live outside the City," she no longer wished to move to the suburbs. *Comer v. Kemp,* 824 F.Supp. at 1125. This is really a mootness argument.

Again, we are not persuaded. Had the court promptly and properly certified the class, this argument would not be available. *Jacobs,* 420 U.S. at 129–30, 95 S.Ct. at 849–50. Nevertheless, we need not decide whether the potential mootness of the claims of the named plaintiffs moots the entire case because, as we stated above, this is certainly the type of harm that is "capable of repetition, yet evading review." *Sosna,* 419 U.S. at 399–400, 95 S.Ct. at 557–58.

Neither the court nor the appellees made any other specific arguments as to the mootness of either the RAC or the Belmont

---

**5.** This rationale may explain *DeFunis,* 416 U.S. at 319–20, 94 S.Ct. at 1707–08, where the Supreme Court held that DeFunis's equal protection claim was moot because DeFunis was in his final quarter of law school and the university made assurances that it would not stand in his way of graduating. *But see Id.* at 348–50, 94 S.Ct. at 1721–22 (Brennan, J., dissenting) (claim is not moot because DeFunis still had not gradu-

ated). Significantly, the majority wrote that: "DeFunis did not cast his suit as a class action, and the only remedy he requested was an injunction commanding his admission to the Law School. He was not only accorded that remedy, but he now has also been irrevocably admitted to the final term of the final year of the Law School course." *Id.* at 317, 94 S.Ct. at 1706.

claims except to the extent that the appellees contend that the court did not, in a later order, abuse its discretion in denying intervenors standing to pursue these claims on mootness grounds. We need not reach this question because we hold that the claims set forth in the RAC and Belmont complaints are not moot.

## VIII. Intervenors

█ The district court never ruled on the merits of the motions of the eleven proposed plaintiffs-intervenors. Instead, on November 5, 1993, the court dismissed their motions as moot because, having dismissed the main causes of action against the defendants, "there [wa]s no longer any case in which intervention [wa]s possible." Order at 1, *Comer v. Kemp,* 89–1556 (W.D.N.Y. Nov. 5, 1993). We now vacate the Order of the district court because, with respect to the RAC and Belmont complaints, we (1) hold that at least one named plaintiff had standing to sue, (2) certify the RAC and Belmont subclasses and hold that certification relates back to the filing of the complaint, and (3) hold that these class actions are not moot. We remand the motions of the intervenors to the district court for a consideration on the merits of these motions. Although there is no longer a need for the intervenors to step in to save the claims, *see Spangler,* 427 U.S. at 430–31, 96 S.Ct. at 2702; *Palmigiano,* 425 U.S. at 310 n. 1, 96 S.Ct. at 1554 n. 1, we direct the district court to consider the claims of the plaintiffs-intervenors under the rule for permissive intervention, Fed. R.Civ.P. 24(b), together with the following guidelines.

> Under Rule 24(b):
> Upon timely application anyone may be permitted to intervene in an action ... when an applicant's claim ... and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Under this standard for permissive intervention, and given the circumstances of this case, the intervenors certainly had standing at the time they filed their motions to intervene. Furthermore, claims of the intervenors and those presented by the plaintiffs in the main cause of action present common issues of fact and identical issues of law. Like the plaintiffs, the intervenors are low-income minority residents of the City of Buffalo who have applied for and/or have been denied housing subsidies. Finally, we find that the claims presented by the intervenors would not delay or prejudice the adjudication of the rights of either the original parties or the class members, but will in fact help to facilitate a resolution in this case.

Take Saren Lewis, for instance. Saren Lewis is an African–American, single parent, and college student in the City of Buffalo. She supports herself and her daughter on a public assistance grant of $419 a month. In the summer of 1990, Lewis was living in a city apartment when her landlady told her to move so that she could rent the apartment to someone else. At the end of August 1990, Lewis applied for a Belmont Section 8 subsidy. In her application, she indicated that she was paying more than 50% of her income for rent and utilities and that she had been involuntarily displaced, thereby making her eligible for a federal preference. Belmont placed Lewis on a waiting list. Early in 1991, Lewis called Belmont to inquire about the status of her application. She was told that there were many people ahead of her. Affidavit of Saren Lewis in Support of Plaintiff's Motion to Intervene, at 2, *Comer v. Kemp,* No. 89–1556 (W.D.N.Y. Aug. 3, 1992) ("Lewis Aff."). When she called again in March 1992, a Belmont Housing Programs Manager told her that she would be considered for a subsidy only after all people who did not live in the city were considered for a subsidy. At Lewis's request, the Manager placed this information in writing. (Letter from Kathy O'Brien, Belmont Housing Programs Manager, to Saren Lewis of 3/10/92, attached to Lewis Aff.). In the meantime, Lewis has found housing in a BMHA project which is 95% minority-occupied. In May 1992, Lewis called Belmont once again to inform Belmont that she had to move out of the BMHA project quickly because her next door neighbor physically assaulted and

threatened her with a knife. A Belmont staff agent told her that there was nothing he could do for her. Lewis is now homeless, although living with a friend in a Buffalo apartment on a temporary basis. Meanwhile, suburban families, such as the family of affiant Ann Palmer, who applied for subsidies months and years after Lewis, have received their subsidies. Lewis and her small daughter continue to wait.

The stories of Dorothy Solomon and Betty Smith are similar to that of Saren Lewis. All three are African–American single parents who claim a federal preference. Solomon alleges that she was never given information about Belmont's suburban housing program. Smith alleges that Belmont officials told her that she would have a better chance of receiving a subsidy if she moved to the suburbs. The families of Dorothy Solomon and Betty Smith continue to wait with Saren Lewis and many other African–American families.

## IX. Transfer

We will not transfer this case to another judge in part because the BMHA complaint has not been disposed of. We do not expect that the courthouse doors will remain shut to these plaintiffs, the class members, or the intervenors.

## X. Judgment as to Richard L. Higgins

■ We have been asked to examine one final issue on appeal: Did the court properly dismiss the claims against state-defendant Richard L. Higgins regarding federally-aided housing projects and sever the claims against him regarding the state aided housing projects. Insofar as this claim comes before us on the district court's grant of Higgins's motion to dismiss the complaint, we accept as true the factual allegations of the complaint. See, e.g., Square D., 476 U.S. at 411, 106 S.Ct. at 1923; Scheuer, 416 U.S. at 236, 94 S.Ct. at 1686; Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1098 (2d Cir.1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989). In reviewing such motions, we must read the complaint liberally drawing all inferences in favor of the pleader. See, e.g., Scheuer, 416 U.S. at 236, 94 S.Ct. at

1686; Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989). The district court must "deny the motion [to dismiss] unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir.1984).

### A. Background Facts and the BMHA Complaint

We need only examine those facts necessary to determine whether the court properly dismissed the BMHA complaint against Richard L. Higgins.

The BMHA is an independent housing authority established under the provisions of article 5 of the former state housing law. N.Y.Pub.Hous.Law § 403 (McKinney 1989). "[I]n connection with a federal or municipal project, any federally-aided program," New York has empowered BMHA, as a PHA, to contract with the federal government to provide housing for low-income individuals. N.Y.Pub.Hous.Law § 37(1)(i) (McKinney 1989). Pursuant to the Public Housing Law, a "federal project" is "a project aided or financed in whole or in part, by the federal government." N.Y.Pub.Hous.Law § 3(15) (McKinney 1989). In contrast, a "state project" is one "aided or financed in whole or in part by the state and not by the federal government." Id. at § 3(16). And a "municipal project" is "a project other than a state project or a federal project." Id. at § 3(17).

BMHA and the City of Buffalo together administer 29 public housing projects, 25 of which are federal projects, and 4 of which are state projects. Only two of the state projects remain in operation.

The plaintiffs contend that BMHA, the City of Buffalo, and DHCR Commissioner Richard L. Higgins, have allowed the two non-operational state projects to become uninhabitable and have taken steps to transfer these projects to private ownership.

DHCR provides housing authorities with state funding for their Section 8 programs. BMHA state-aided projects receive no federal funds. In fact, state and federal moneys cannot be used jointly to finance a project, N.Y.Pub.Hous.Law § 70 (McKinney 1989),

and no state housing monies allocated to an authority or a municipality can be commingled with federal monies without DHCR Commissioner Higgins' approval. *See* N.Y.Pub.Hous.Law § 75 (McKinney 1989).

In the BMHA/DHCR loan/subsidy contract, BMHA has agreed that it will not obtain funds from any source other than the state without DHCR Commissioner Higgins' approval. Moreover, in each BMHA contract with DHCR, the authority has agreed to place the funds and income with respect to the relevant project in a separate fund earmarked for the operation of that project.

Jessie Comer, Rosemary Comer, Jewel Culverhouse, Hazel Grimes, and Annette McCutcheon, individually and on behalf of themselves and all those similarly situated, (the "BMHA plaintiffs"), filed a First Amended Complaint against the federal defendants; BMHA; Lawrence A. Grisanti, individually and in his official capacity as former Executive Director of the BMHA; the City of Buffalo; James D. Griffin, in his official capacity as Mayor of the City of Buffalo; and Richard L. Higgins, individually and in his official capacity as DHCR Commissioner (collectively, the "BMHA defendants"). The BMHA plaintiffs raise both constitutional and statutory claims with respect to three sets of claims against the BMHA defendants: (1) BMHA's alleged unlawful segregation and racial discrimination, (2) the alleged violation of the CDBG Program, and (3) the alleged unlawful conversion of the Kensington Heights and Ellicott Mall public housing projects. With respect to claims (1) and (2), the RAC and BMHA Complaints are identical except for some minor organizational differences. *Compare* RAC Complaint, ¶¶ 124–129, 131–146 *with* BMHA Complaint, ¶¶ 222–226, 228–231, 233, 232, 244, 234–243. The major difference comes with the added third claim which we need not review because the district court has severed this claim from this action. *Comer v. Kemp,* 824 F.Supp. at 1134. Additionally, the district court severed the segregation claim with respect to the state funded projects. The district court then dismissed the remaining claims of segregation and ra-

cial discrimination in violation of the Constitution, the FHA, and the CDBG.

**B. Analysis of the Dismissal of the Complaint Against Higgins**

Reviewing the facts in the light most favorable to the BMHA plaintiffs as against Higgins, we find that there are no genuine issues of material fact and that the district court properly dismissed the claims against Higgins relating to the federally-aided housing projects.

We begin with an examination of the common ground. BMHA is a creation of New York state with the power to administer both federal and state housing projects. BMHA and the City of Buffalo together administer 29 public housing projects, 25 of which are federal projects, and 4 of which are state projects. Significantly, and as we explained above, New York State DHCR provides housing authorities with state funding for their Section 8 programs. BMHA administers both federal and state projects, but state-aided projects receive no federal funds. In fact, there is no commingling of state housing with federal housing moneys without DHCR Commissioner Higgins' approval. N.Y.Pub.Hous.Law §§ 70, 75.

Nevertheless, these federal projects are not administratively divided from the state projects. The BMHA plaintiffs contend, and Higgins has not disputed, that BMHA administers a single waiting list for both its state and federal projects. Furthermore, HUD regulations specifically prescribe that tenant selection policies and procedures shall be in compliance with the nondiscrimination requirements of Title VI. 24 C.F.R. 960.204. Therefore, to the extent that these lists are intermingled, and to the extent that tenant selection is racially discriminatory, facts which the BMHA plaintiffs allege, then those with authority over such projects are in violation of the constitution, federal law, and state law.

The BMHA defendants contend that Higgins himself had no authority to intervene. The BMHA plaintiffs contend that "[t]he state Commissioner has the authority and responsibility ... to intervene in the operation of local housing authorities to assure the

protection of state and federal civil rights laws. Commissioner Higgins' failure to exercise that authority with respect to BMHA both as state *and* federal projects is the gravamen of the claims against him in this action." Brief for Appellants at 83 (citing N.Y.Pub.Hous.Law §§ 223, 14(1)(d)).

Our question is two-fold: Does Higgins have authority to remedy the effects of BMHA's discriminatory housing practices; and If so, does Higgins have a qualified immunity? Although these questions are somewhat intermingled, we begin with the question of authority.

If Higgins did have authority to intervene, and he knew about the discriminatory practices in the tenant selection process, then he could be liable under 42 U.S.C. § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991); *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989); *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *United States v. Oswald,* 510 F.2d 583, 589 (2d Cir.1975). As Higgins correctly points out, the sole statutory authority on which the BMHA plaintiffs premise Higgins' authority, as DHCR Commissioner, to interfere with the administration of federal housing projects is N.Y.Pub.Hous.Law § 223, which provides that "[f]or all the purposes of this chapter, no person shall, because of race ... be subjected to any discrimination." We agree with the BMHA defendants that the DHCR Commissioner, as a creation of the State of New York, has limited powers, and that, pursuant to N.Y.Pub.Hous.Law § 14, the enumerated powers of the DHCR Commissioner do not extend to the enforcement of any statute in federal projects. We conclude that the BMHA plaintiffs do not allege sufficient facts to demonstrate that Higgins has acted under color of state law with respect to the federal projects. The fact that Higgins shares a tenant list with the federal agencies is not enough to demonstrate that Higgins had authority over these projects.

In summary, we affirm the judgment of the district court dismissing the complaint against Higgins regarding the federal projects and severing the remaining claims.

## XI. Conclusion

In short, we find that we do not have jurisdiction over the appeal from the dismissal of the claims against BMHA; we affirm the judgment of the district court dismissing the complaint against Higgins with respect to the federal projects. We vacate the judgment of the district court in all other respects and remand for further proceedings not inconsistent with this opinion.